IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

CHARLES SHEPPARD,

    Plaintiff,

v.                                                         Case No. 19-CV-1401

JULIE LUDWIG, ET AL.,

    Defendants.

## DEFENDANTS RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Defendants, through their attorneys, Wisconsin Attorney General Joshua L. Kaul, and Assistant Attorney General Kevin L. Grzebielski, hereby respond to Plaintiff's Proposed Finding of Fact, as follows:

1. Plaintiff Charles Sheppard repeatedly told FLCI staff members that the plastic chair that they were providing him was unable to hold up his weight and that he had just recently went through this at his previous inst (WSPF) and as a result he'd harmed himself as a result of his chair collapsing under his weight. (See Sheppard declaration ¶ 1)

   **RESPONSE: No dispute that Plaintiff told various Defendants that he wanted a stronger chair. However, the Defendants properly responded by stating that the Special Needs Committee (that is responsible for that decision) would soon be**

> **considering his request. (*See* Ludwig Decl. ¶ 8; Whitman Decl. ¶ 15.)**

2. On 6-3-19 Plaintiff Sheppard was transferred to FLCI from WSPF, where he was housed on the medical Unit 3. Instead of being placed on the receiving unit which is 9. He was put on the medical unit instead of the intake unit due to his medical restrictions. (See Sheppard declaration ¶ 2)

   > **RESPONSE: No dispute.**

3. Plaintiff Sheppard had a medical restriction to use his wheelchair in his cell to sit in until his bariatric chair arrived. This medical restriction was ordered on 1-4-19 and wasn't supposed to expire until 1-5-20. (See Sheppard declaration ¶ 3) (also see Exhibit A DOC-0529)

   > **RESPONSE: No dispute that Plaintiff had a medical restriction to use a wheelchair because he reported that he broke a chair at his previous institution. However, the issue in this case is whether Defendants were deliberately indifferent towards Plaintiff's need for a sturdier chair. And, the evidence shows that they did not act with deliberate indifference.**

4. The restriction to use the wheelchair in place of the plastic chair was given to me because the plastic chair wouldn't hold up my weight and because I'd harmed myself by sitting in the plastic chair and having it break on multiple occasions. (See Sheppard declaration., ¶ ¶ 3-4)

> **RESPONSE: No dispute that Plaintiff reported that he broke a chair at his previous institution. However, the issue in this case is whether Defendants were deliberately indifferent towards Plaintiff's need for a sturdier chair. And, the evidence shows that they did not act with deliberate indifference.**

5. There's absolutely no-way that maintenance could determine how much weight my chair could hold because they can't account for wear and tear or how old the chairs are. (See Sheppard declaration ¶ 5)

   > **RESPONSE: Dispute. Inmates at Fox Lake are provided with a plastic chair to use in their cells and in the dayrooms. This chair is designed to hold a static weight of 1500 pounds. (Kuehn Decl. ¶ 5, Ex. 1002.) Defendants filed a pamphlet from the chair's manufacturer stating that the static load is 1500 pounds. Plaintiff provides no evidence, other than his own opinion, that the chair was not able to hold his weight.**

6. The plastic chair that I had was old, it had flimsy legs and had scratches on it as well. (See Sheppard declaration ¶ 6)

   > **RESPONSE: Dispute. Inmates at Fox Lake are provided with a plastic chair to use in their cells and in the dayrooms. This chair is designed to hold a static weight of 1500 pounds. (Kuehn Decl. ¶ 5, Ex. 1002.) Defendants filed a pamphlet from the chair's manufacturer stating that the static load is 1500 pounds.**

**Plaintiff provides no evidence, other than his own opinion, that the chair was not able to hold his weight.**

7. Dr. Gavin wrote me a medical restriction ordering that I be allowed to use a wheelchair for distances and use a wheelchair in place of my plastic chair in my cell to sit in. (See Sheppard declaration ¶ 7) also see Ex. A).

   **RESPONSE:**

8. I harmed myself while at WSPF and banged my head due to the plastic chair in my cell collapsing. (See Sheppard declaration ¶ 8) also see Ex. B).

   **RESPONSE: No dispute that Plaintiff reported that a chair he was sitting in broke. Dispute that medical note states that chair in his cell collapsed. Additionally, Plaintiff provides no proof, other than what he told the nurse, that a prior chair at a different institution broke. He also does not show that the chair was the same as the chair that he was provided at Fox Lake.**

9. Dr. Gavin reiterated that I be allowed to use a wheelchair for distance by writing another ORDER/MEDICAL RESTRICTION on 5-16-19 and it wasn't supposed to expire until 5-15-20. (See Sheppard declaration ¶ 9) also see EX: DOC-0525.

   **RESPONSE: No dispute that Plaintiff received a wheelchair order. However, the Special Needs Committee at his new institution was tasked with determining how restrictions could best serve Plaintiff. (Whitman Decl. ¶ 22.) The Special Needs**

> Committee denied his request due to his BMI and pain complaints and the need for him to increase his movement. He was provided with a bench-seated walker that he could sit on and take a break if necessary. (Ex. 1004 at 3-4.)

10. I wrote an inmate complaint to L. Bartow and I explained to her that I could not sit in the plastic chair I was issued. I told Ms. Bartow that I'd harmed myself for the exact same matter and that I'd already filed Complaint No. WSPF 2019-9747. I told her that WSPF staff ignored my pleas for a sturdier chair and now FLCI is doing the exact same thing. (See Sheppard declaration ¶ 13).

    **RESPONSE: No dispute.**

11. ICE Ms. Bartow wrote me back acknowledging my complaint on 6-21-19. Under the Brief Summary section she stated, "Inmate claims the plastic chair in his cell is unable to hold up his weight." (See Sheppard decl. ¶ 14).

    **RESPONSE: No dispute.**

12. Laura Bartow has the authority to take corrective action in all matters regarding staff incidents when an inmate files a complaint on that matter. All Ms. Bartow had to do was call maintenance and tell them to bring me a more adequate chair. (See Sheppard decl. ¶ ¶ 15-16).

    **RESPONSE: Dispute. The Special Needs Committee had the authority to approve Plaintiff for a different chair. As an ICE, Bartow does not make decision on what chair an inmate is**

**assigned. When an inmate requests a special accommodation (like a special chair), the Special Needs Committee addresses the request (Bartow Decl. ¶ 8.) Additionally, Plaintiff provides no evidence, besides his own belief, to dispute Bartow's testimony.**

13. On 6-28-19 I spoke to Julie Ludwig. At this meeting we spoke very thoroughly and in great detail about the issues I was having with the plastic chair in my cell. I told Ms. Ludwig how I'd already harmed myself at my previous institution (WSPF) and suffered an concussion as a result of my plastic chair breaking on me there, because it was unable to hold up my weight. I told Ms. Ludwig that the same chair I'm being offered here at FLCJ is the same one I had at WSPF when I harmed myself. I told her the chair had already collapsed under me, that staff were forcing me to use the chair in the dayroom, that there's a metal chair in the basement and how I have a restriction to use a wheelchair in place of the plastic chair. (See Sheppard decl. ¶ 17).

    **RESPONSE: No dispute that Plaintiff and Ludwig discussed his request for a different chair four days before the Special Needs Committee was going to consider the request. (Ludwig Decl. ¶ 11.) Additionally, Ludwig did not have the authority to issue a sturdier chair without approval from the Special Needs Committee and/or permission/approval from security on what type of chair could be issued. (Ludwig Decl. ¶ 12.)**

14. I wrote Ms. Whitman about the entire exchange that I had with Ms. Ludwig and I saw her shortly after when I was at HSU to get my pregabalin meds. Where I asked her if she got my letter she asked me what it was about and I summarized it and she said that she got it. (See Sheppard decl. ¶ 18).

> **RESPONSE: Dispute. Upon review of Plaintiff's HSU record, Whitman has been unable to locate any HSRs or other correspondence submitted by Plaintiff between June 3, 2019 and July 2, 2019 in which he requested a different/new chair. (Whitman Decl. ¶ 14, Ex. 1001 at 34-37.)**

15. On 7-1-19 I was sitting in the plastic chair in my cell writing when the chairs legs just collapsed under my weight and I fell backwards hittin the back of my head on the metal bedframe. My head was bleeding very badly. (See Sheppard decl. ¶ 19).

> **RESPONSE: Dispute. Plaintiff's chair was still intact; however, there were obvious stress marks on the back legs. (Studenec Decl. ¶ 6.) The most common cause of chairs breaking is because inmates often lean back in their chairs on two legs or up against their bunks. This is an improper use of the chairs and can compromise the structural integrity of the chair and lead to the chair breaking. (Kuehn Decl. ¶ 7.)**

16. My cellmate went to go and get the 3rd shift Sgt. who promptly responded and they called the on-call RN who told them to take me to the ER after I vomited at the ER I was diagnosed with an CONCUSSION. (See Sheppard decl. ¶ 19).

> **RESPONSE: No dispute.**

17. I was in extreme pains a result of this fall. I had migraine headaches very intensely for over a month following the fall. I hurt my neck, back and had to be given Physical Therapy and I still get neck and back spasms to this day. (See Sheppard decl. ¶ 20) also see defendants exhibit 1001-001.

> **RESPONSE: No dispute for purpose of summary judgment. However, there is no evidence that any Defendant was aware of Plaintiff's injuries or that his injuries somehow made Defendants' actions deliberately indifferent.**

18. As part of my verbal discharge instructions I was told by the doctor at the ER that I needed to relax, not walk around, and let my brain rest. (See Sheppard decl. ¶ 21).

> **RESPONSE: No dispute for purposed of summary judgment that these were verbal discharge instructions. However, the discharge instructions did not state that Plaintiff was required to "relax, not walk, and rest," nor did the hospital order or recommend that Sheppard have a wheelchair restriction. (Whitman Decl. ¶ 19, Ex. 1001 at 4-6, 23-29.)**

19. On 7-2-19 the Special Needs Committee decided to have a meeting and discuss my medical restrictions the following staff members LUDWIG, WHITMAN, BARTOW, RAHR, SIEDSCHLAG, TASSLER, CHAMBERLAIN, SPORS, HANNI, MLODZIK, and HOLT reviewed my medical files where they discussed the fact that I'd just gotten back from the ER and had been diagnosed with an concussion yet they still chose to discontinue my wheelchair for distance restriction. (See Sheppard decl. ¶ 22).

> **RESPONSE: Dispute. Plaintiff provides no evidence that the Special Needs Committee discussed that Plaintiff had just returned from the ER and had been diagnosed with a concussion. The Special Needs Committee meeting was scheduled for 12:45pm and Sheppard's discharge paperwork from the hospital is stamped 2:41pm. (Ex. 1001 at 23-27.) Additionally, nothing in Plaintiff's discharge paperwork indicated that he needed a wheelchair. Providing Sheppard with a bench-seat walker was consistent with the recommendation from the hospital (which did not include that he needed a wheelchair) and with the need for Sheppard to walk for his health. (Ludwig Decl. ¶ 17; Whitman Decl. ¶ 32.)**

20. On 7-3-19 it was time for me to go and get my night/HS medication but I was feeling extremely disoriented and loopy and I had extreme balance issues, so I

had the unit officer call HSU for me and ask them if they could bring my meds to me on the unit. (See Sheppard decl. ¶ 23).

> **RESPONSE: No dispute that Plaintiff did not feel well and requested that his medication be brought to him.**

21. On 7-3-19 the unit officer called me into his office where he shut the door and he turned on the speaker-phone and called HSU. The call was answered by RN Jan Britt. I personally told Ms. Britt that there was no-way I could walk physically up that hill with a walker to HSU because I was feeling very loopy, dizzy, and disoriented. I explained to Ms. Britt that I was just recently released from the ER where I was diagnosed with an concussion. She told me that she already knew that but, that my wheelchair for distance restriction had been discontinued and that I needed to walk to HSU. (See Sheppard decl. ¶ 24).

> **RESPONSE: Dispute. Britt did not speak with Mr. Sheppard. (Britt Decl. ¶ 6.) Additionally, Britt was not aware at the time that, as a result of Plaintiff's concussion, he was having trouble walking. Plaintiff also had been provided with a walked that he could use to sit on if he needed to take a break from walking. (Britt Decl. ¶ 7.)**

22. I asked Ms. Britt if she could make an exception and allow someone to push me up there and she said, "NO!" So I asked her if she could just bring the meds to me on the unit? She raised her voice and said NO I needed to come to HSU now. I told her well I can't make it I'll refuse them she said that's not acceptable

I needed to refuse in person or else I was going to be getting a conduct report. (See Sheppard decl. ¶ 24).

> **RESPONSE: Dispute. Britt did not speak with Mr. Sheppard. (Britt Decl. ¶ 6.) Additionally, Britt was not aware at the time that, as a result of Plaintiff's concussion, he was having trouble walking. Plaintiff also had been provided with a walked that he could use to sit on if he needed to take a break from walking. (Britt Decl. ¶ 7.)**

23. Because I didn't want to get a conduct report I grabbed my Walker and attempted to walk up the hill to HSU. My balance and equilibrium was off though and I was very dizzy and I ended up falling over and rolling down the hill where I smacked my head on the concrete. (See Sheppard decl. ¶ 25).

> **RESPONSE: Dispute. Plaintiff did not fall over, roll down the hill, and smack his head on the concrete. Rather, Plaintiff reported to Britt that he had sat down on the grass himself and did not fall. Britt asked Mr. Sheppard if he had sat down on the grass himself when he felt dizzy. He said he did, and he no longer claimed that he couldn't remember. (Britt Decl. ¶ 13, Ex. 1001 at 3.)**

24. I was out of it for awhile but I recall several C/O's coming to pick me up off the ground and putting me in a wheelchair and escorting me to HSU. When Ms. Britt asked me what happened I told her that I fell over and hit my head on

the concrete. I never once told her that I just got dizzy and sat in the grass. (See Sheppard decl. ¶ 26).

> **RESPONSE: Dispute. When he arrived in HSU, Plaintiff initially stated he could not remember what happened or who helped him. (Britt Decl. ¶ 12, Ex. 1001 at 3.) Britt then called Officer Ray to come into the exam room. Britt told Mr. Sheppard that it was reported to her that he had sat down on the grass himself and did not fall. Britt asked Mr. Sheppard if he had sat down on the grass himself when he felt dizzy. He said he did, and he no longer claimed that he couldn't remember. (Britt Decl. ¶ 13, Ex. 1001 at 3.)**

25. FLCI had multiple Bariatric chairs in fact I was given one on 7-3-19 with metal legs and I had no issues with it at all. It held my weight up without any problems. The Sgt. got the chair from the basement of Unit 3. (See Sheppard decl. ¶ 27).

> **RESPONSE: No dispute that there were other chairs available for Plaintiff. Dispute that the other chairs were more likely to support Plaintiff's weight versus the chair he had. The chair originally provided to Plaintiff has a weight bearing capacity of up to 1500 pounds. (Bartow Decl. ¶ 13.)**

26. When I got out of seg in Feb. of 2020 I was sent to Unit 5 where I was given a broken chair with a broken plastic back, and metal legs. It was NOT the same bariatric chair that I was given on 7-3-20. (See Sheppard decl. ¶ 28).

> **RESPONSE: This proposed finding of fact is irrelevant to the current litigation based on Plaintiff's complaint regarding his chair in June and July 2019. Therefore, the Court should disregard it.**

Date: October 23, 2020.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Kevin L. Grzebielski
KEVIN L. GRZEBIELSKI
Assistant Attorney General
State Bar #1098414

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7234 (Grzebielski)
(608) 267-8906 (Fax)
grzebielskikl@doj.state.wi.us