UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**CHARLES SHEPPARD,**

    Plaintiff,

    v.                                                  Case No. 19-CV-1401

**JULIE LUDWIG, et al.,**

    Defendants.

### DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Charles Sheppard, a Wisconsin inmate representing himself, filed a lawsuit under 42 U.S.C. § 1983, alleging that defendants violated the Eighth Amendment when they were deliberately indifferent to the conditions of his confinement and/or his serious medical conditions. Before me is defendants' motion for summary judgment. For the reasons explained below, I will grant the motion and dismiss this case.

### RELEVANT FACTS

At the relevant time, Sheppard was incarcerated at Fox Lake Correctional Institution, where the defendants worked. (ECF No. 26 at ¶¶ 1-14.) Candace Whitman was the health services manager; Julie Ludwig was a nurse clinician 4; Jan Britt was a nurse clinician 2; Laura Bartow was an institution complaint examiner; Joy Tassler was a correctional management services director; Pat Chamberlin was

the buildings and grounds superintendent/ADA coordinator; Bruce Siedschlag was a programs director; Jared Spors was a recreation leader; Jeremy Hanni was a correctional security supervisor; Randall Hepp was the warden; Brad Mlodzik was the deputy warden; John Bahr was a correctional sergeant; and Anthony Holt was a correctional officer. (*Id.* at ¶¶ 2-14.)

   1. *Sheppard's Requests for a Sturdier Chair*

Sheppard is 400 pounds. (ECF No. 12 at 2.) When he transferred to Fox Lake from Waupun Correctional Institution on June 3, 2019, there was a plastic chair in his cell. (ECF No. 35 at ¶ 2.) According to Sheppard, while at Waupun, he had been given a medical restriction to use a wheelchair, including in his cell, because a similar plastic chair would not hold his weight. (*Id.* at ¶¶ 3-4.)

On June 21, 2019, the inmate complaint examiners' office received an inmate complaint from Sheppard complaining that the chair in his cell was unable to hold his weight. (ECF No. 26 at ¶¶ 37-38.) Bartow, the assigned inmate complaint examiner, contacted health services manager Whitman regarding Sheppard's request for a different chair. (*Id.* at ¶ 39.) Whitman told Bartow that the special needs committee would be reviewing Sheppard's special needs requests on July 2, 2019, and that she would provide Bartow with an update after the meeting. (*Id.*) Bartow also spoke with a correctional officer from the sanitation department who told her that the plastic chairs used at Fox Lake have a weight-bearing capacity of up to 700 pounds. (*Id.* at ¶ 40.) It was later discovered that the chairs are designed to have a

2

Case 2:19-cv-01401-NJ   Filed 12/02/20   Page 2 of 14   Document 37

weight-bearing capacity of up to 1,500 pounds. (*Id.* at ¶ 40, 65.) Bartow decided to wait for the special needs committee to evaluate Sheppard's request.

About a week after Sheppard filed his inmate complaint, on June 28, 2019, Ludwig met with Sheppard in advance of the special needs committee meeting a few days later on July 2, 2019, to discuss Sheppard's request for various medical accommodations. (ECF No. 26 at ¶ 22.) According to Sheppard, he told Ludwig about the issues he was having with his chair, including that it had collapsed under him. (ECF No. 32 at ¶¶ 25-26.) He explained that the chair was unable to hold his weight and that he had had a similar chair at Waupun, which had also collapsed under him. (*Id.* at ¶¶ 25-26.) He also told her that the officers would not let him use his wheelchair in his cell. (*Id.* at ¶ 25.) He informed her there was a sturdier chair in the basement that he would like to use. (*Id.*)

Ludwig explains that Sheppard showed her previously approved special needs paperwork from Waupun. (ECF No. 26 at ¶ 25.) She noted that a sturdier chair was not approved. (*Id.*) Ludwig did not think Sheppard was in danger from sitting in the chair for a few more days before the special needs committee meeting because he had been using the chair without incident since arriving at Fox Lake about a month earlier. (*Id.* at ¶ 26.) Ludwig explains that she did not have the authority to issue a sturdier chair without approval of the special needs committee and/or permission/approval from security on what type of chair could be issued. (*Id.* at ¶ 27.)

Sheppard asserts that he wrote Whitman, the health services manager, about his exchange with Ludwig and that he later confirmed with her in person that she

3

had received his letter. (ECF No. 32 at ¶ 32.) Whitman asserts that she has no record of Sheppard requesting a different chair. (ECF No. 26 at ¶ 32.) She notes that, when Sheppard arrived at Fox Lake, he did not have a restriction for a special chair, and she believed his request for a chair was not an urgent need and could wait until the special needs committee meeting. (*Id.* at ¶ 33.) Sheppard points out that a doctor at Waupun had said he could use his wheelchair in place of the plastic chair in his cell. (ECF No. 32 at ¶ 33.)

2. *Sheppard's July 2, 2019 Incident*

On July 2, 2019, officers went to Sheppard's cell after learning he had fallen out of his chair and hit his head. (ECF No. 26 at ¶ 43.) Staff gave him ice and told him to sit down, take it easy, and staff would check on him later. (*Id.* at ¶ 43.) The chair was still intact, but one of the officers could see obvious stress marks on the back legs. (*Id.* at ¶ 44.) Shortly thereafter, Sheppard left his room to go to the bathroom, got dizzy, and vomited. (*Id.* at ¶ 45.) Sheppard was sent to the hospital, where he was diagnosed with a concussion and discharged later that day. (*Id.* at ¶ 46.)

When he returned to Fox Lake, nurse Britt examined him and gave him written and oral instructions on concussions. (ECF No. 26 at ¶ 47.) Whitman reviewed the nursing note after Sheppard's return to Fox Lake. (*Id.* at ¶ 48.) The discharge instructions did not state that Sheppard was required to "relax, not walk, and rest," nor did the order recommend a wheelchair restriction. (*Id.*)

4

3. *Special Needs Committee*

The special needs committee met on July 2, 2019, before Sheppard returned from the hospital, to discuss multiple restrictions for him. (ECF No. 26 at ¶ 56.) Ludwig believes the committee knew that Sheppard had been sent to the emergency room in the middle of the night after he fell out of his chair. (*Id.* at ¶ 61.) The committee denied his request for a wheelchair for distance. (*Id.* at ¶ 57.) Because of his weight and pain complaints, the committee decided that Sheppard would benefit from increased movement. (*Id.* at ¶¶57, 59-60.) The committee gave him a bench-seated walker that he could sit on and take a break if he needed to. (*Id.* at ¶¶ 57-58.)

The plastic chair that Sheppard had been given was designed to hold a static weight of 1,500 pounds. (ECF No. 26 at ¶ 65.) Static weight is the amount of completely still, unchanging, and unmoving weight that can be put on the chair without causing it damage. (*Id.* at ¶ 66.) When a plastic chair breaks, it is often because an inmate leans back in the chair on two legs or up against their bunks. (*Id.* at ¶ 67.) This improper use can compromise the structural integrity of the chair. (*Id.* at ¶ 68.) Despite the plastic chair being sufficient to hold his weight, the committee approved Sheppard's request for a bariatric chair, and provided him with an all steel/metal chair. (*Id.* at ¶¶ 41, 63.)

4. *Walking to Health Services for Medication*

Britt explains that, after Sheppard returned from the hospital, she received a phone call from an officer telling her that Sheppard did not want to walk to health services to get his medication. (ECF No. 26 at ¶ 72.) Britt says she did not speak

5

directly to Sheppard and does not remember the officer giving her any reason why Sheppard could not walk to health services. (*Id.*) She advised the officer that Sheppard needed to walk to health services; she said he could use his walker. (*Id.*)

Sheppard insists he spoke directly to Britt on speaker phone. (ECF No. 32 at ¶ 72.) He says he told her there was no way he could walk up the hill to health services because he was feeling "extremely loopy, dizzy, and disoriented." (*Id.*) He also informed her that he had just been released from the emergency room, where he had been diagnosed with a concussion. (*Id.* at ¶ 75.) According to Sheppard, Britt told him that he would be given a conduct report if he did not come to health services and sign a refusal. (*Id.* at ¶ 74.) Britt does not remember threatening a conduct report. (ECF No. 26 at ¶ 78.)

As Sheppard walked to health services, he got dizzy, fell down the hill, and "smacked" his head on the concrete. (ECF No. 32 at ¶ 79.) Officers were able to help Sheppard into a wheelchair and take him to health services, where he told Britt what had happened. (*Id.* at ¶¶ 80-82.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). When considering a motion for summary judgment, the court takes evidence in the light most favorable to the non-moving party and must

6

grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

1. *Sheppard's Requests for a Sturdier Chair*

Sheppard asserts that Ludwig, Whitman, and Bartow were deliberately indifferent to his need for a sturdier chair.[1] "Prison conditions violate the

---

[1] Sheppard was also allowed to proceed against Warden Hepp on this claim, but Sheppard concedes in his response to defendants' summary judgment motion that Hepp is entitled to summary judgment.

7

Constitution only where they 'deprive inmates of the minimal civilized measures of life's necessities.'" *Sanders v. Kingston*, 53 F. App'x 781, 783 (7th Cir. 2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). As I observed in my original screening order, the Constitution does not require prison officials to provide inmates with chairs because denying an inmate a chair does not impose a condition that denies "the minimal civilized measure of life's necessities." (ECF No. 5 at 5.) I observed that, if Sheppard felt his chair was unsafe, he could have sat on his bed or the floor. When Sheppard moved for reconsideration of my decision denying him the opportunity to proceed on that claim, he explained that his weight and other health conditions made it difficult if not impossible for him to sit on his bed or the floor. (ECF No. 8.) Given Sheppard's unique challenges, I agreed to let him proceed on that claim.

With a fully developed record, it has become clear that these defendants refused to provide Sheppard with a different chair for only a short period of time until the special needs committee could consider his request. (Sheppard does not dispute that he had been using the plastic chair without issue for several weeks before raising his concerns with these defendants.) Bartow learned about his request on June 21, a little more than a week before the special needs committee met. And he spoke to Ludwig and Whitman on June 28, just a few days before the special needs committee met. Even considering Sheppard's unique challenges, no jury could reasonably conclude that him not having access to a suitable chair for less than two weeks deprived him of the minimal civilized measures of life's necessities. As the Supreme Court has noted, "the Constitution does not mandate comfortable prisons, and prisons

8

… which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

Further, even if I were to construe Sheppard's claim to be that these defendants exposed him to a serious risk of harm by allowing him to use a chair that he told them was insufficient to hold his weight, his claim would still fail because no reasonable jury could conclude that Ludwig, Whitman, and Bartow knew he faced a substantial risk of serious harm. Bartow investigated Sheppard's complaint by talking to Whitman, who told her that the special needs committee would consider his request in the next couple of weeks. She also talked to a sanitation department officer who told her the chair could hold up to 700 pounds (in actuality, the chair is designed to hold up to 1,500 pounds). Ludwig and Whitman knew that Sheppard's request would be considered in just a few days and that he had been using the chair for nearly a month without incident. Sheppard asserts that he told them that he knew from experience that chairs like his were insufficient to hold his weight and that the chair had already collapsed under him, but prison staff "are neither required nor expected to believe everything inmates tell them." *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). In any event, none of these defendants forced Sheppard to sit in the chair in the days leading up to the special needs committee meeting.

Finally, even if the defendants knew he faced a substantial risk of harm by sitting in the chair (again, no one forced him to sit in the chair), the evidence shows that none of them had the authority to provide him with a different chair. Only the

9

special needs committee was empowered to provide inmates with accommodations such as special chairs. The Seventh Circuit has explained that:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules … along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Ludwig, Whitman, and Bartow cannot be liable simply because they did not immediately respond to Sheppard's demands and instead waited, as policy required, for the special needs committee to consider his request. They are entitled to summary judgment on this claim.

   2. *Denial of a Wheelchair by the Special Needs Committee*

Sheppard asserts that members of the special needs committee (Ludwig, Whitman, Bartow, Bahr, Siedschlag, Tassler, Chamberlin, Spors, Hanni, Mlodzik, and Holt) were deliberately indifferent to his serious medical needs when they canceled his wheelchair restriction shortly after he sustained a concussion. The court uses a two-part test to evaluate whether a response to a medical condition amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the [defendants were] deliberately indifferent to that condition." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)).

10

Sheppard suffered from a number of serious medical conditions, including obesity, joint pain, diabetic neuropathy, and back spasms. The defendants explain that, in light of Sheppard's weight and body pains, they believed he would benefit from increased movement. As such, they canceled his wheelchair restriction and provided him a bench-style walker, which would give him the opportunity to move while also providing him with a place to sit and rest when he needed to.

It is well established that a disagreement with a medical professional's chosen course of treatment is insufficient to support an Eighth Amendment claim. *Snipes v. DeTella*, 95 F.3d 586, 592 7th Cir. 1996). Sheppard wanted a wheelchair, but inmates do not get to dictate the particulars of their care. The special needs committee exercised its judgment to benefit Sheppard's health, not because they were deliberately indifferent to his health.

Sheppard focuses on the fact that they canceled his wheelchair shortly after he suffered a concussion. But, although the special needs committee knew he had been sent to the hospital, it did not know he had been diagnosed with a concussion because he had not yet returned to Fox Lake before the committee made its decision. The defendants cannot have been deliberately indifferent to a condition they did not know about. And, even if they had had the benefit of his discharge papers, nothing in those papers indicated that Sheppard should be allowed to use a wheelchair as a result of his concussion. The defendants are entitled to summary judgment on this claim.

### 3. *Denial of Wheelchair by Britt*

Shortly after Sheppard returned from the hospital, he asked if his medications could be brought to him in his cell. Britt said no and instructed him to walk to health services to either take his medication or sign a refusal to do so. Sheppard asserts that he told her he had just been released from the hospital with a concussion and that he felt "extremely loopy, dizzy, and disoriented."

Sheppard's claim fails because no jury could reasonably conclude that he suffered from an objectively serious medical condition. *See Kimbrough v. Stutleen*, 411 F. App'x 882, 884 (7th Cir. 2011) (finding that symptoms of dizziness, fatigue, and shortness of breath were not objectively serious). Nor could a jury reasonably conclude that Britt was deliberately indifferent to the risks of harm his condition created. Sheppard's discharge papers did not indicate that he was unable to walk or that he needed to use a wheelchair. And, Britt knew Sheppard had been given a walker for support, which had a bench he could sit on if he needed to rest or if he began to feel dizzy. This was an adequate (if not perfect) protection against any risk of harm he faced as a result of his concussion symptoms. Britt is entitled to summary judgment.

## MOTION FOR COUNSEL

On November 4, 2020, Sheppard filed a motion for the recruitment of counsel, specifically for mediation and trial, if needed. (ECF No. 36.) As explained in this decision, the defendants are entitled to summary judgment, so there is no need for mediation or trial. I will deny Sheppard's motion.

12

**IT IS THEREFORE ORDERED** that Sheppard's motion for recruitment of counsel (ECF No. 36) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 18) is **GRANTED** and this case is **DISMISSED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 2nd day of December, 2020.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge